UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

AUG 1 4 2008

LAWRENCE K. BAERMAN, CLERK
ALBANY

RICHARD MINSKY, an individual, d/b/a
SLART® ENTERPRISES,

Civil Case No.: 08-CV-819

Plaintiff

vs.

Linden Research, Inc., d/b/a Linden Lab®,
a Delaware corporation, John Doe (a/k/a
Victor Vezina), an individual, Philip
Rosedale, an individual, Mitchell Kapor,
an individual, other Does, presently
unknown to Plaintiff

Defendants

**AMENDED COMPLAINT OF
TRADEMARK INFRINGEMENT
AND DILUTION, CONTRIBUTORY
INFRINGEMENT AND DILUTION,
TORTIOUS INTERFERENCE,
FRAUD**

## JURISDICTION

1.    Jurisdiction is proper in this court because this litigation arises under federal law,

15 USC §1114 et seq., 28 USC §§ 1331, 1338 and 2201.

## PARTIES AND VENUE

2.    Plaintiff: Richard Minsky, d/b/a SLART Enterprises (hereinafter "I" or

"me"), is an individual resident of Columbia County, New York at 413 County Route 22,

Hudson, NY  12534, d/b/a Slart Enterprises. I am an artist, a composer, a musician, a writer, a

curator of exhibitions, an educator, an event organizer, a scholar, and a publisher. I am

recognized internationally as a leader in the field of Book Art. Among my publications is

SLART® Magazine. My activities include the SLART Gallery, SLART Academy, and other

products and services produced under the SLART brand.

1

3.          Defendant: Linden Research, Inc., d/b/a Linden Lab® (hereinafter
"Linden"), is a Delaware corporation with principal offices in San Francisco, California. Their
General Counsel is Martin Roberts (a/k/a Marty Linden). Address: Martin Roberts, General
Counsel, Linden Research, Inc., 945 Battery Street, San Francisco, CA 94111. Based on
information and belief, Linden is engaged in the business of creating and providing an electronic
multiplayer role-playing virtual reality entertainment platform accessible by a communications
network. They purvey this platform under the name Second Life® at secondlife.com.  Second
Life (hereinafter SL) is advertised, distributed, and operated via the Internet to customers within
the jurisdiction of this Court.

4.          Defendant:  John Doe (a/k/a Victor Vezina), is believed to be an
individual. "Victor Vezina" is an "avatar" name used within the Second Life virtual world. An
avatar is a character representing a "resident" in SL that is operated by a person using the SL
software. The real identity of Vezina is believed to be known to Linden. Real name and address
is unknown to Plaintiff. One purpose of the present action is to compel Linden to identify this
Defendant.

5.          Defendant:  Mitchell Kapor is an individual, 543 Howard St., Suite 500,
San Francisco, CA 94105. Mr. Kapor is a member of Linden's Board of Directors, is an investor
in Linden, and was Chairman of Linden during part of the time covered in this complaint

6.          Defendant:  Philip Rosedale is an individual, 2717 Pacific Ave., San
Francisco, CA 94115-1129. Mr. Rosedale is the Founder of Linden Research, Inc., and currently
Chairman.

7.          Defendants: Other Does are individuals who are currently unknown to
Plaintiff, and who are "residents" of SL.

2

## ALLEGATIONS

### I. General Allegations

8.          Linden entices people to join SL and start businesses that make real money. Once someone downloads the software and opens an account they become a "resident" of SL. Residents can buy and sell Linden Dollars (L$), exchanging them for real world currencies. Linden operates a currency exchange for this purpose called the LindeX™. The SL website lists many businesses that residents have started and encourages this activity. [Exhibit A, page 23]

9.          Linden claims to respect the intellectual property rights of residents and real life companies that may or may not have a presence in the Second Life world.

10.          On November 19, 2006, I registered as a user of SL and chose the avatar name ArtWorld Market. I discovered that there were artists creating within this platform, artists who used the SL platform for social and business networking, and artists who import images of their real world artworks into SL and sell copies of these images to other residents in exchange for Linden dollars (represented by the symbol L$). There were also art galleries and art museums. There were about one million registered users claimed by Linden at that time, and when I went online there would be about 7,000 residents on simultaneously, according to the statistics that Linden put on the log-in screen. SL then started growing rapidly, at the rate of about a million users a month. A year later there were about 10 million "residents" claimed, with about 35,000 on when I would log in. Now it is common to have 50,000 or more users simultaneously online.

11.          After a week or so exploring the art galleries of SL I decided to open a gallery there, reselling works that I acquired from other residents. I also decided to start a critical review

3

of the arts and publish it as a website, as a real world book, and as a book inside SL. I thought about a name that could be used not only for the gallery and magazine, but for purposes beyond SL—for real world activities, such as a real world gallery showing traditional media, for publications that went beyond SL, for an art school, for publishing art online, for publishing musical works, and for other activities that I was thinking about, and came up with the name SLART.

12.       SLART has a great sound as a name, and is also funny, because of the several colloquial meanings it has, including a slut's fart, a fart made while sleeping, and someone who is between a slut and a tart. I searched SL using the SL search feature to see if anyone else was using it, and there were no uses found. I also searched online with Google and found no uses of SLART, other than the definitions relating to sluts and farts. I decided that SLART would be my brand name.

13.       During the last week of November, 2006, I rented a space in SL for the SLART Gallery in a region named "Tamarack" from a group named "Skye Condos." This was a virtual building that was situated in the sky. In SL you can place things hundreds of meters in the air, and avatars can come by teleporting. That means you can almost instantly (when it's working properly) go from one place to another in SL simply by clicking your mouse on a link or map. I have maintained at least one SLART gallery in Skye Condos continuously since then, and at one time rented five condo galleries simultaneously that were linked by teleport devices or bridges. Shortly after renting the SLART Gallery space I registered the domain name "slartmagazine.com" for the online publication. That was December 14, 2006. I immediately began to review art exhibitions inside SL and write editorials about the business practices of creating, producing, distributing, selling and collecting virtual art, and how this differed from the

4

Real Life (RL) art business. In real life I have been in the art business for over 35 years, as an artist, a gallery owner, and in other roles in both the profit sector and the not-for-profit sector. Articles about my work have appeared in many publications, including *The New York Times, The Wall Street Journal* and *Money* Magazine. I identified the SL gallery and the magazine with the brand SLART™, using the TM symbol to establish my claim to the trademark.

14.      This activity gained international fame almost instantly when, on January 23, 2007, the lead article in ARTNET News was about my launching SLART Magazine ("First-Rate Art In 'Second Life'"). ARTNET is an industry leader in fine art business information.  I was contacted for interviews by journalists in the USA and abroad.  There soon were articles about my launch of SLART Magazine in publications around the world, including *artArt* (Jan. 29, 2007, "Slart: Art Magazine in Second Life"), *Artkrush* (issue 51, Feb. 7, 2007, "Mag Tracks Art of Second Life"), *NowPublic* (Feb. 7, 2007, "SLART Tracks Art of Second Life"), *La Brujula Verde* (February 9, 2007 "Slart, el arte en Second Life"), *Ciberescrituras* (Feb. 17, 2007 "Slart: magazine y galerías de Arte en Second Life"), *Brink* (March 3, 2007, "Hyperart"), and more.

15.      On March 22, 2007 I filed for SLART trademark registration with the United States Patent and Trademark Office (USPTO).

16.      On April 13, 2007 my activity with SLART Magazine was the subject of a half-page feature in the paper edition of *Financial Times Deutschland* ("Second Life - das ist Beuys zu Ende gedacht: Richard Minsky, 60, startete im Januar "Slart", das erste Magazin, das sich ausschließlich mit der Kunstszene im virtuellen Rollenspiel "Second Life" beschäftigt"), and also on their website. That was followed in Germany a month later by a major article on my

creation of SLART Magazine in *Die Zeit* (April 26, 2007, "Pixel und Papier"). SLART Magazine became an industry leader on art in Second Life.

17.      On May 11, 2007 I was interviewed in New York City at the facilities of WNYC for the Public Radio International program *Studio 360*. A few days later, on May 16, I presented a SLART "Tour of the Second Life Art World" at Location One, an art center in Manhattan's SOHO art district. This was an event in which my computer screen of SL was projected onto a large screen to a full house. I showed the real art world audience, most of whom had never seen SL, some examples of what the SL artists were doing. Simultaneously, a video feed of the real life (RL) presentation was streamed into SL, where a group of artists' avatars had gathered around a video screen in a region in SL owned by the New Media Consortium, a not-for-profit association of major institutions that is exploring the uses of SL for educational, cultural, and other purposes. This may have been the first event of its kind, in which the audience in RL and the artists in SL could see each other, and interact through streaming video. The artists in SL could tell the RL audience about their work and answer questions from the audience.

18.      On July 5, 2007 an Office Action was issued by the USPTO on the SLART trademark application with two items: One was a statement that they found no similar registered or pending mark which would bar registration. The other was a descriptive refusal, accompanied by 34 examples from the Internet, and saying that "the proposed mark merely describes the feature of applicant's services," and, "The term "SLART" is commonly used to describe art within the online world Second Life."

19.      I responded on July 12, pointing out that none of the 34 examples included the term SLART. All used the descriptive phrase SL Art, which is in common use to describe art in SL, because it is an abbreviation of Second Life Art, and is pronounced "ess ell art." That is

not the same as "slart," which sounds distinctly different. I stated that I do not consider SL Art to be an infringement of the SLART trademark. I further provided the USPTO with copied text and screen shots of an online dictionary that had five definitions of slart with connotations of farts, sluts, etc. I also pointed out, not without humor, that those interpretations of SLART did not signify the feature of a service, except perhaps in the sense of services within those meanings, which are not in my Classes of Goods & Services.

20.       The USPTO ruled in my favor, that the SLART mark is distinctive from SL Art and not merely descriptive, and on August 29 issued a Notice of Publication. The SLART mark was published for opposition on September 18, 2007. There was no opposition, and Registration Certificate 3399258 was awarded March 18, 2008 for the standard character mark SLART (Exhibit B, page 24).

21.       On August 25, 2007 I presented a paper on The Art World Market of Second Life as a session in the Business Track at the Second Life Community Conference (SLCC) held at the Chicago Hilton. It was considered a popular presentation and since then over 13,000 copies of the paper have been downloaded from the SLART website.

22.       In November, 2007 I issued the first SLART Monograph in two archival paper editions, a limited edition soft cover book and a deluxe hardcover edition. Copies were purchased by such prestigious institutions as Stanford University and Yale University, and The Morgan Library and Museum.

23.       Subsequently I changed the SLART Magazine motto from "a critical review and journal of the arts in Second Life" to "a critical review and journal of the virtual arts." More recently it changed to "a critical review of virtual business and culture," reflecting the evolving direction of the publication and the emergence of other virtual worlds. The other

worlds do not as yet have the capabilities for artists that SL has, but there are systems in development that should provide opportunities for artists and related businesses in the near future. There are also web-based 3-D internet applications being developed that are not "virtual worlds." I am now researching them for an article.

## II. The Present Complaint

24.        In March, 2008 I discovered through the SL search feature that an avatar named Victor Vezina was using the name "SLART Garden" for an art gallery and "SLartists of Second Life" as the name of a Group. A Group enables two or more residents to jointly own property, communicate by a different method called "Group Notices," and send Instant Messages (IM's) to the group.

25.        I contacted an attorney who operates a non-profit legal service inside Second Life using the avatar name Juris Amat. The service is named Virtual Intellectual Property Organization (VIPO). In RL her name is Tamiko Franklin, and she lives in Croatia. She is American with a Masters of Intellectual Property Law and is a member of the Massachusetts Bar. On March 16 Ms. Franklin sent Vezina a cease and desist (c&d) notice by Instant Message (IM). Vezina did not respond. IM's do not provide proof of delivery. They can fail to be delivered. Not knowing who Vezina is in real life, we had no way of serving a paper notice, or of being assured that Vezina had in fact been made aware that s/he was infringing on my SLART trademark

26.        On April 22 I wrote to Martin Roberts, Linden's General Counsel, asking Linden to notify Vezina to cease and desist from the unauthorized use of my SLART trademark in Second Life, and to follow through with appropriate remedies if there was no compliance. This was sent U.S. Priority Mail, and was received April 24. I received no response from Mr. Roberts and Vezina's infringing use remained in Second Life.

8

27.     I asked Ms. Franklin to contact Mr. Roberts and find out what happened. She called Mr. Roberts' office on May 13.  On May 23 she received an e-mail response from an attorney in Mr. Roberts' office named Laura Pirri. That day I searched for SLart Garden in SL and could not find it. I thought that meant Linden had acted on my request.

28.     Ms. Pirri and Ms. Franklin spoke by telephone on May 28. Ms. Franklin e-mailed me and said that Ms. Pirri indicated that Linden was not responsible for the disappearance of SLart Garden and that Linden will not remove the infringing material. Ms. Pirri also told Ms. Franklin that Linden wanted me to abandon the SLART mark before the USPTO, to stop approaching other residents regarding their unauthorized use of the mark, and to comply with the terms of use of the SL license. In a follow up e-mail on May 29, Ms. Pirri wrote: "Richard Minsky is welcome to take advantage of this license, for example, he could use "SL Art Magazine" under the license." The SL License is a recent development [Exhibit D, pp 27-32]. It was issued on March 24, 2008 as part of Linden's new "Brand Center."

29.     Since SLart Garden had disappeared I thought that I no longer had cause to pursue the matter with Linden, and told that to Ms. Franklin.  The other parts of Ms. Pirri's demands were ridiculous and I did not address them. I had no intention of abandoning my Federal Trademark and licensing theirs instead. Besides the fact that I own the SLART trademark and would not want to use a licensed mark, the name "SL Art Magazine" is not distinctive the way SLART is, does not sound as good, doesn't have the multiple meanings that SLART has, and most importantly, the terms of the Brand Center License would limit the content of my magazine to art in SL [Exhibit D, p. 29, #6. **For the Second Life World Only**]. And I would not stop approaching other residents who infringe my mark. That is absurd. I have to protect my mark.

9

30.     On May 29 Ms. Franklin wrote to Ms. Pirri saying "…he [Minsky] has informed me that he will no longer pursue action concerning the matter contained in his letter to Mr. Roberts as the cause for his concern no longer exists."

31.     Ms. Pirri replied on June 2:

"And did you confirm that he'll abandon the SLArt registration with the USPTO?   And that he'll stop his demands that other Residents not use SLArt?  Please confirm that.  It's important that he understand that he doesn't have the right to a mark that contains our mark, and that he doesn't have the right to demand that other Residents not make nominative fair use of SLArt."

32.     On June 3 Ms. Franklin replied to Ms. Pirri:

"As Mr. Minsky's legal representative, I'm not in a position to advise him to abandon his trademark when there are absolutely no legal grounds for doing so.
Perhaps you can tell me... why is abandoning the registration in his legal interest?
        Our position is this, the question of whether SLART and SL Art are the same has already been decided in favor of Mr. Minsky. SLART is a registered trademark and we reject assertions based on there being no legal difference between it and the term SL Art.  Consequently, it is in the interest of Linden Research, Inc. that its employees, agents, representatives and other responsible persons do not support or condone infringing uses of the SLART trademark, either directly or indirectly.
        Mr. Minsky is a trademark owner and as such will continue to enforce his right against infringing uses of his trademark and (yes) infringing uses include those which 1) advertise products or services that may easily be identified by the use of non-infringing terms (such as SL Art or SL Artists) or 2) may be construed as suggesting his sponsorship or endorsement.

33.     Ms. Pirri wrote back a long rambling letter continuing to claim SL Art and Slart were the same, that it was descriptive; that I must abandon my trademark and that I must license their trademark. She wrote "We don't recognize Richard's trademark claim to "SLArt," nor will we prevent others from making nominative fair use of our trademarks to describe art in Second Life."

34.         On July 11 I again searched for SLart Garden and this time I found it. I could not tell whether it had gone and come back, or had not showed up for a time in Search because of defects in the SL search process or other malfunctions in the SL system. SL is in constant development, with server software and viewing software being changed frequently, many bugs, crashes, disappearing inventory, disappearing objects, disappearing places, maps not working, teleports not working, and other malfunctions. Vezina had changed and expanded SLart Garden. Instead of saying SLart Garden, his gallery now had big signs that said SLART. I filed an abuse report immediately, a procedure you follow in SL when there is an issue with another resident. I also saved snapshots on my computer (Exhibit C, pp. 25-26). The report was filed inside the SL world from the offending location. The system automatically notes the precise location of your avatar when the report is filed, and it included a snapshot of the scene I saw there, with the infringing SLART sign. I received e-mail confirmation of the abuse report. This is the text of the report I filed:

> I am the owner of the standard character trademark SLART (USPTO Reg. No. 3399258). I also own the SLART GALLERY. This gallery is infringing on the trademark. The TOS assures me of protection for my Intellectual Property. In addition to using a large logo that says SLART on the gallery, there is also a sign that says SLART SQUARE, and the land is named "SLart Garden TEDONG SIM!" These are all in violation.

35.         On July 16 Ms. Pirri wrote to Ms. Franklin asking if we could schedule a phone call. On July 17 I participated in a three-way phone call with Ms. Pirri and Ms. Franklin. It was a disappointing phone call. Ms. Pirri spent a lot of time pressing me for details of my business plan, which is proprietary information, and reiterated that Linden will not recognize the

11

SLART trademark. She tried to entice me to abandon my mark by saying that Linden would like
to feature me on their website but will not unless I abandon my mark.

36.            Linden owns all the material presented in Second Life. The SL Terms of
Service (TOS) section 3.3 states:

> "Linden Lab retains ownership of the account and related data, regardless of
> intellectual property rights you may have in content you create or otherwise
> own.
>     You agree that even though you may retain certain copyright or other
> intellectual property rights with respect to Content you create while using the
> Service, you do not own the account you use to access the Service, nor do you
> own any data Linden Lab stores on Linden Lab servers (including without
> limitation any data representing or embodying any or all of your Content).
> Your intellectual property rights do not confer any rights of access to the
> Service or any rights to data stored by or on behalf of Linden Lab."

37.            On July 29 I filed a Civil Complaint, Case No.: 08-CV-819, of which this
is the amended complaint, and sent it to Mr. Roberts with a Waiver of Service of Summons. The
complaint was signed for on July 31. I followed up with an e-mail to Mr. Roberts, Mr. Rosedale,
and Mr. Kapor on August 1. On August 4 Mr. Roberts replied to my e-mail and asked if we
could speak on the phone the next day. On August 5 there was a phone conversation attended by
Mr. Roberts, Ms. Pirri, myself, and an intellectual property attorney whom I asked to listen in on
my behalf named John Koegel of New York City. Ms. Franklin was on vacation. Mr. Roberts
said that the conversation would be subject to Federal Rule of Evidence 408 and we all agreed to
that.

38.            Following this conversation I entered the Second Life world and went to
the parcel that had been named SLart Garden, and where the SLART signs had been. The name
of the parcel had been changed and the signs were gone.

39.     I do not know exactly how Linden arranged for the infringing material to disappear, or whether this disappearance is permanent. It had disappeared previously and then reappeared over a month later (¶¶27-30 above).

## CLAIMS FOR RELIEF

## CLAIM ONE

### (Declaratory Judgment of Trademark Infringement and dilution, contributory infringement and dilution, 15 U.S.C. §1114 et seq.)

40.     I own a valid registered Federal Trademark awarded by the USPTO.  Linden Lab wishes I didn't have it but they had an opportunity to oppose the registration of the mark and they did not.

41.     Linden made statements implying or stating that it is their mark, such as ¶¶31-33 above. Those statements confuse the ownership of the SLART mark and are deceptive as to the source of my goods and services.

42.     If Linden doesn't think I should have the mark they can go to the USPTO and try to get it cancelled, which Laura Pirri threatened to do if I do not abandon it, as part of Linden's intimidation tactic. Linden stands to receive economic benefit from the dilution of the mark, in terms of furthering their intention, as demonstrated by the imposition of the Brand Center License, to establish their universal right to any mark used by residents that has the letters

SL in it. Their assertion that they can determine what is a valid trademark, even after federal registration has occurred, and in turn judge what is an infringing use that must be removed from their Service and what is not, operates only to benefit their interests.

43.     Linden claims they own the infringing material [¶36]. Linden chose to keep the infringing material up and served it to the public for months after they were notified it was infringing.

44.     Linden refused to notify Vezina of the violation, refused to remove the offending material or sanction Vezina for the violation, denied that they were violating my Intellectual Property rights, and denied the validity of my federal registered trademark, which they had not opposed before or after registration, until I filed a Federal Complaint. At that point the infringing material disappeared, but this could be temporary, and does not address the fundamental principle of a cease and desist order.

45.     If the infringing user was not given proper notification concerning the infringement of my SLART trademark, and there is no compliance agreement from the infringing party, then there is likelihood of further infringement, whether in SL or elsewhere. The infringer may not have been told that my SLART trademark rights were being infringed. It is hard enough to serve cease and desist notices or complaints on someone who is hiding behind the protection of a company that preserves their anonymity. If Linden is allowed to keep notices from being served by hiding the legal identity of the infringing party and does not serve the same or effectively similar notice themselves, then they are complicit and contributory in encouraging future acts of infringement by the same person, whether in a medium they control or elsewhere.

46.     The chilling possibility, if not likelihood, is that Linden is using language in their communication with the infringing resident that is similar to or identical to the language

14

they used with me and with Ms. Franklin, and may have stated or implied to the infringing party that use of the SLART trademark is owned or controlled by Linden. That would confuse the infringing party and deceive them as to the true ownership of the SLART mark. If I don't have access to the notices that Linden sent I cannot know.

47.      Even if Linden did or does serve a notice on their "resident," and provides me with assurance that Victor Vezina has accepted service of a notice that Richard Minsky owns the Federal Registered Trademark SLART, Reg. # 3399258, and has agreed to desist from infringement of my rights, another John or Jane Doe may be the same legal entity. If I don't know who that is then the same person could be infringing my mark using another identity within SL, or a different name in another identity-protecting virtual world, or a user name on a blog, or a legal name or corporate identity. If I don't know who Vezina or another infringing party really is, how would I know whether another infringing use was being perpetrated by the same individual in violation of the cease and desist agreement? That would make prosecution impossible.

48.      Plaintiff seeks declaratory judgment from this court that Linden's unauthorized display of the SLART trademark in the Second Life virtual world following the initial notice of infringement sent on April 22, their failure to serve a proper cease and desist notice on the infringing party, their failure to identify the infringing party so a proper notice could be served by me, and their usage of language in infringement notices that does not clearly identify me as the owner of a valid trademark or that implies that they own or control my SLART mark, constitutes trademark infringement and dilution, and contributory trademark infringement and dilution.

15

## CLAIM TWO

## (Declaratory Judgment of Trademark Infringement and dilution, contributory infringement and dilution, 15 U.S.C. §1114 et seq.)

49.        John Doe (a/k/a Victor Vezina) is supposedly the creator of the infringing SLART sign and gallery in Second Life. I don't know if Vezina is an individual, a corporation, a partnership, or if Vezina really exists outside of the Linden computer. Whatever sort of entity Vezina is, the person or persons operating that account in Second Life infringed on my SLART trademark.

50.        Plaintiff seeks declaratory judgment from this court that the uses of my trademark "SLART" by John Doe (a/k/a Victor Vezina) as described in ¶ ¶ 24, 34 and Exhibit B constituted infringement and dilution of my SLART trademark, and that effectively similar uses in the future by Vezina or anyone else, whether in Second Life or elsewhere, would constitute infringement and dilution of my SLART trademark.

## CLAIM THREE

51.        Every day that Linden is allowed to infringe on and dilute the SLART mark and assist or encourage others in infringement and dilution of it inures to their benefit and causes irreparable harm to the plaintiff. Linden is trying to intimidate me into abandoning a valid Federal trademark in order to illegally expand their reach. The delay they have already caused me by refusing for months to stop the infringement of the SLART trademark in Second Life and by intentionally confusing the ownership of the mark and thereby the source of the SLART products and services has been a real burden.  It has taken huge amounts of my time dealing with their actions and their failures to take action. This has slowed down my ability to develop

16

SLART Enterprises, to research and write timely articles for the magazine, to produce exhibitions and catalogs, to make sales, to develop the SLART Academy, to develop new products and bring them to market. Linden's attempts at confusing the ownership of my SLART trademark have made it difficult, if not impossible, to raise the venture capital needed to advance my business plan in a timely way to take advantage of the fame the SLART mark has acquired, and reduces my competitive advantage by enabling my competitors to gain a lead in time to market. All this is extremely stressful to me personally, and by extension, to my family. It is essential that Linden not be allowed to succeed with that strategy.

52.        Linden not only actively and purposefully refused for over three months to remove any material that infringed on my SLART trademark rights; they refused to provide the identity of whoever created the infringing material.  They are hiding someone from prosecution by making it impossible to serve court papers on that person, if they actually exist.  It is possible that Victor Vezina is not a real person, and that Linden does not provide an identity because Linden created that identity as a pseudonym for their own activities.

53.        Linden used their refusal to recognize my lawful trademark and their refusal to remove the offending material or properly notify the infringer as a tool to try to intimidate and coerce me into giving up my lawful trademark and rename my publication and other activities in a manner that would give them control of the content [¶¶28-35].

54.        Plaintiff seeks judgment from this court that Linden engaged in Tortious Interference.

## CLAIM FOUR

55.        Mitchell Kapor was Chairman of Linden from its early days and Philip Rosedale, the Founder, was CEO. On or about May 15, 2008, Mark Kingdon replaced Mr.

Rosedale as CEO and Mr. Rosedale assumed the position of Chairman. At the present time Mr. Kapor is a member of the Board of Directors. These people have much to gain financially from Linden's growth.

56.     Mitch Kapor is a living legend—among many achievements he is co-Founder of The Electronic Frontier Foundation (www.eff.org), which is a major proponent of Intellectual Property rights in the electronic age. His presence as Chairman and Board member gave credence to the belief that Linden supports Intellectual Property rights.

57.     On July 7, 2008, in a speech celebrating the fifth anniversary of SL, Mitch Kapor said, "...I got involved very very early as the first investor and helping Philip think things through back in 2000." In this speech he also said, "So Second Life at age five serves many purposes. It is a means of economic empowerment, it is a creative outlet and as you know, many people around the world are making a living on their creative work they love doing in Second Life."

58.     In a press release dated November 14, 2003 that is still on the Linden website the headline is "Linden Lab Preserves Real World Intellectual Property Rights of Users of its Second Life Online Service." They have made that a cornerstone of their publicity. That is one of the main reasons I entered SL and started a business there.

59.     During the first part of this period of Linden trying to make me abandon my Federal Registered Trademark SLART, Mr. Kapor was Linden's Chairman. Instead of respecting my lawful trademark and directing his company to obey the law, his legal department refused to act in a lawful manner and respect my Intellectual Property (IP) rights. Especially considering the huge amount of work I had put into building international public awareness of the possibilities and actualities of SL as a creative platform, I felt saddened and betrayed by

Mitchell Kapor, who stands to gain financially from the work I have done promoting SL, but turns out to be interested only in preserving Intellectual Property rights that benefit his investment, and condones and directs Linden's infringement on my IP rights when doing so may inure to the building of his wealth.

60.     Plaintiff seeks judgment from this court that Mitchell Kapor has engaged in fraud.

## CLAIM FIVE

61.     Philip Rosedale was Linden's CEO during the first part of this saga and has been Chairman since Mark Kingdon became CEO in mid-May. Mr. Rosedale has spoken publicly many times about SL supporting IP rights. As with Mr. Kapor, he stands to gain from my work yet had his legal department try to get me to abandon my lawful rights.

62.     On June 23, 2008, in a speech celebrating the fifth anniversary of SL, Linden CEO Mark Kingdon said, "…we are very, very focused on usability and stability so we can continue to bring new Residents into the fold and allow our platform to grow and the economy to thrive. One of the fundamental elements of that is around IP rights. It is really, really important that people who create great content are able to enjoy it and protect it and that was one of the things that Philip put in place and has underpinned the economy as we know it today."

63.     On or about June 11 the Linden legal department wrote to Ms. Franklin, "We don't recognize Richard's trademark claim to "SLArt," nor will we prevent others from making nominative fair use of our trademarks to describe art in Second Life."  Not only did Linden fail to preserve my IP rights, they actively supported infringement of my Federal Registered

Trademark and went one step further, claiming that they owned my trademark. I was flabbergasted.

64.          Plaintiff seeks judgment from this court that Philip Rosedale has engaged in fraud.

## CLAIM SIX

65.     Since November 2003 Linden has claimed they preserve the real world Intellectual Property (IP) rights of users of their service. They claim this differentiates them from their competition. They claim people can make their real world living in SL. This entices people to use their service to create businesses. It enticed me. I believed them.

66.          Linden encouraged businesses to develop in SL for over four years, then issued their Brand Center policy, and are claiming that they own my brand, and that I can't use my brand, and that deprives me of my legal right to use my federal registered trademark.

67.          While denying me my IP rights they continued to claim that they support IP rights.

68.          Their denying my IP rights they claim to support causes me extreme harm.

69.          Plaintiff seeks judgment from this court that Linden has engaged in fraud.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff respectfully requests that this Court grant the following relief:

70.          Enter judgment according to the declaratory relief sought;

71.          Compel Linden and Vezina to cease and desist use of the SLART mark;

72.        Compel Linden

(a) within 72 hours after being sent notice from me or my agent by e-mail, or of receipt by mail via the U.S. Post Office, to notify "residents" of Second Life, or users of any other service provided by Linden, who are the creators and/or presenters of infringing material, that they are infringing on rights to the Federal Registered Trademark SLART, Registration Number 3399258, owned by Richard Minsky, and must cease and desist from infringing on the mark;

(b) to remove infringing uses of the SLART mark by any of its "residents," or other users, within seven days of being notified of such infringement, if the infringing users do not voluntarily comply with (a);

(c) within 7 days of being sent the notice in (a) to provide information to me on the legal identities and locations of infringing "residents" or other users, including "Victor Vezina" and other Does, if and when such are discovered;

(d) within 48 hours of sending any notice per (a), to send me a true copy of the notice, and of any other communications that may relate to my rights;

(e) to refrain from demanding that I cease contacting other "residents" of SL or other Linden service users when I discover infringing uses of my SLART trademark;

73.        Award plaintiff damages of $1,000 per day, commencing April 24, 2008, for each act or incident of infringement, and for each claim, with treble damages;

74.        Award plaintiff his costs in this action;

75.        Enter such other further relief to which plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: ~~July 28,~~ Aug 14, 2008

Signature of Plaintiff

EXHIBIT A

Photo of the Second Life website page enticing people to make "part or all of their real life living" from businesses inside SL.



EXHIBIT B

The SLART USPTO Registration

Int. Cl.: 41

Prior U.S. Cls.: 100, 101, and 107

**United States Patent and Trademark Office**

Reg. No. 3,399,258
Registered Mar. 18, 2008

**SERVICE MARK**
**PRINCIPAL REGISTER**

# SLART

MINSKY, RICHARD P. (UNITED STATES INDI-
VIDUAL)
413 COUNTY ROUTE 22
HUDSON, NY 12534

FOR: MULTIMEDIA PUBLISHING OF BOOKS,
MAGAZINES, JOURNALS, SOFTWARE, GAMES,
MUSIC, AND ELECTRONIC PUBLICATIONS; ON-
LINE PUBLICATION OF ART; PUBLICATION OF
ELECTRONIC MAGAZINES; PUBLICATION OF
ELECTRONIC NEWSPAPERS ACCESSIBLE VIA A
GLOBAL COMPUTER NETWORK; PUBLICATION
OF THE EDITORIAL CONTENT OF SITES ACCES-
SIBLE VIA A GLOBAL COMPUTER NETWORK;
PUBLISHING OF ELECTRONIC PUBLICATIONS;
ART EXHIBITIONS; CONDUCTING WORKSHOPS
AND SEMINARS IN ART; INSTRUCTION IN THE
FIELD OF ART; WORKSHOPS AND SEMINARS IN
THE FIELD OF ART; PUBLICATION AND EDITING
OF PRINTED MATTER; PUBLICATION OF BOOKS;
PUBLICATION OF BOOKS, MAGAZINES, ALMA-
NACS AND JOURNALS; PUBLICATION OF BOOKS,
OF MAGAZINES, OF JOURNALS, OF NEWSPA-
PERS, OF PERIODICALS, OF CATALOGS, OF BRO-
CHURES; PUBLICATION OF BOOKS, REVIEWS;
PUBLICATION OF BROCHURES; PUBLICATION
OF DOCUMENTS IN THE FIELD OF TRAINING,
SCIENCE, PUBLIC LAW AND SOCIAL AFFAIRS;
PUBLICATION OF JOURNALS; PUBLICATION OF

LEAFLETS; PUBLICATION OF MAGAZINES; PUB-
LICATION OF MANUALS; PUBLICATION OF MU-
SICAL TEXTS; PUBLICATION OF PRINTED
MATTER; PUBLICATION OF TEXT BOOKS; PUB-
LICATION OF TEXTS, BOOKS, JOURNALS; PUBLI-
CATION OF TEXTS, BOOKS, MAGAZINES AND
OTHER PRINTED MATTER; EDUCATION IN THE
FIELD OF ART RENDERED THROUGH CORRE-
SPONDENCE COURSES; EDUCATION IN THE
FIELD OF ART RENDERED THROUGH VIDEO
CONFERENCE; EDUCATIONAL SERVICES IN THE
NATURE OF ART SCHOOLS; ORGANIZING COM-
MUNITY FESTIVALS FEATURING A VARIETY OF
ACTIVITIES, NAMELY, SPORTING EVENTS, ART
EXHIBITIONS, FLEA MARKETS, ETHNIC DANCES
AND THE LIKE, IN CLASS 41 (U.S. CLS. 100, 101
AND 107).

FIRST USE 12-9-2006; IN COMMERCE 12-14-2006.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SN 77-137,283, FILED 3-22-2007.

KATHLEEN LORENZO, EXAMINING ATTORNEY

24

EXHIBIT C

3 Photos of Slart Garden in Second Life, owned by SL resident "Victor Vezina"



1. Above: the art gallery there is identified by the name SLART.



2. Above: view of the other side of the same wall as shown in picture 1.



3. The same area from a viewpoint further back, to include the sign that says SLart square.

EXHIBIT D

THE SECOND LIFE BRAND CENTER LICENSE

Copied from http://secondlife.com/corporate/brand/trademark/sl_insl.php on August 13, 2008

License To Use SL™ or inSL™

Unlike all of our other trademarks, you have special permission to show the association of your business or organization with the Second Life® virtual world by using "SL" or "inSL" with your business or organization name, product or service name, and Internet domain name (any or all of these names, when used with "SL" or "inSL," are referred to as your "SL Associated Name") *as long as you follow our*:

- Guidelines for Using SL™ or inSL™; and
- Terms and Conditions for Using SL™ or inSL™.

By using an SL Associated Name, you indicate your agreement to be bound by the Guidelines and Terms and Conditions below. If you don't agree to them, do not use "SL" or "inSL" with any of your business or organization names, product or service names, or Internet domain names.

## Guidelines for Using SL™ or inSL™

1. **Prerequisites**. Your business or organization must have a presence in or be associated with the Second Life world. Your product or service must be for use in or with the Second Life world and must not be a 3D virtual world or a platform for a 3D virtual world.
2. **Naming Guidelines**. Your SL Associated Name must use "SL" or "inSL" (but not both) in combination with your own word mark (for example, Dell® or Toyota®, if you own those word marks), or in combination with a name that uses at least two generic nouns. A "generic noun" is a common noun and not a proper noun, trademark or brand name. Your SL Associated Name must not include any Linden Lab trademark other than "SL" or "inSL" or anything confusingly similar to a Linden Lab trademark. For example:

     **This is OK:**
     Dell SL
     Dell inSL
     SL Budget Shopping Guide
     Chic Clothing Boutique inSL
     SL Architectural Design Services Inc.
     SL Chinese Residents Association

     **This is NOT OK:**
     Dell Second Life (can't use "Second Life")
     Dell 2nd Life (can't use abbreviation of "Second Life")

SL Shopping (must use at least two generic nouns with "SL")
Clothing inSL (must use at least two generic nouns with "inSL")
SL Design (only one generic noun; must use at least two with "SL")
China SL ("China" is a proper noun; need at least two generic nouns)
SL Linden Dollar Service (can't use "Linden")

3. **Domain Name Guidelines**. You may use and register your SL Associated Name as a second-level domain name—or the identifying part of a domain name that commonly refers to the organization or entity that registered it—as long as it is your full SL Associated Name and not abbreviated, except that you may register a domain name that's an acronym based on your full SL Associated Name. The domain name need not include corporate designators like "Inc.," "Co.," "LP," "LLP," or "GmbH." For example:

**This is OK:**
DellSL.com
Dell-SL.com
DellinSL.com
SLArchitecturalDesignServices.com
SLADS.com (acronym for SL Architectural Design Services Inc.)

**This is NOT OK:**
DellSecondLife.com (can't use "Second Life")
Dell-SecondLife.com (can't use "Second Life")
SLArchitecture.com (must use at least two generic nouns with "SL")
SLDesign.com (only one generic noun; must use at least two)

If you've registered your own word mark or your name with two or more generic nouns as a second-level domain name, you may use "SL" or "inSL" as the subdomain or third-level domain, which is the part of the domain name before the second-level domain. You may also use "SL" or "inSL" in the URL path after your domain name. For example,

**This is OK:**
http://inSL.Dell.com (domain name with the Dell word mark)
http://SL.Dell.com
http://www.Dell.com/SL
http://www.Dell.com/inSL
http://inSL.ArchitecturalDesignServices.com (domain name with two generic nouns, "Design" and "Services")
http://SL.ArchitecturalDesignServices.com
http://www.ArchitecturalDesignServices.com/SL
http://www.ArchitecturalDesignServices.com/inSL

4. **No Trademark or Business-Name Registration**. Never register your full SL Associated Name, or any part of your SL Associated Name that includes "SL" or "inSL," as a trademark, service mark, or business or organization name. For example:

**This is OK to register:**
Architectural Design Services

**This is NOT OK to register:**
SL Architectural Design Services (can't include "SL")
Architectural Design Services inSL (can't include "inSL")

5. **No Linden Lab Names or Affiliation**. Your SL Associated Name must not be confusingly similar to any of <u>Linden Lab's trademarks</u>, any of our Internet domain names, or any of our products or services, including but not limited to our virtual world platform, tools, and scripting language, our virtual currency services, virtual land services, in-world content, and informational resources in-world, on our website, or anywhere else. Your SL Associated Name must never imply a false relationship with or sponsorship, endorsement, or employment by Linden Lab. For example:

**This is NOT OK:**
SL Virtual World Platform
SL Teen Grid
Virtual Currency Exchange inSL
SL Land Auctions
SL Avatar Skin
SL Avatar Clothing
SL Source Code
SL Viewer Software
SL Scripting Language Guide
SL Architecture Working Group
Inventory Folder inSL
Image Upload Tool inSL
World Map inSL
Permissions System inSL
SL Resident Newsletter
SL Community Forums
SL Support Portal
SL Knowledge Base

6. **For the Second Life World Only**. Your SL Associated Name must not be used to refer to a product or service that is not for the Second Life world. For example, the "SL Budget Shopping Guide" must not be a guide to shopping in "Real Life" shops (e.g., those in New York City) or to shopping in a virtual world other than the Second Life world.

Similarly, your SL Associated Name must not be used to refer to a business or organization that is not in or about the Second Life world. For example, if you provide architectural design services in "Real Life" (e.g., New York City) or in or for a virtual world other than the Second Life world, you must not use "SL Architectural Design Services Inc." to refer to your business providing architectural design services outside the Second Life world.

7. **Impermissible Use**. Your SL Associated Name must not be, and must not be used for any business, organization, product, service, website, or activity that is, in Linden Lab's sole opinion:
    - Violent, racially intolerant, or advocating against any individual, group, or organization;
    - Pornographic, profane, or not suitable for a PG rating;
    - Related to gambling or casinos;
    - In violation of or promoting violation of Linden Lab's Terms of Service or Community Standards;
    - Illegal, promoting illegal activity, or infringing legal rights; or
    - Misleading, defamatory, disparaging, tarnishing, obscene, or otherwise objectionable.
8. **Display Requirements**. Do not make "SL" or "inSL" appear more prominently than the rest of your SL Associated Name, for example, in size, color, or typeface. Except in domain names, "SL" must always appear with both the "S" and the "L" capitalized, and "inSL" must always appear with the "i" and "n" in lower case, and the "S" and "L" in upper case.
9. **Notice and Disclaimer**. You must use a legible and reasonably prominent notice and disclaimer in the following format: "Second Life, SL, and inSL are trademarks of Linden Research, Inc. (Your SL Associated Name) is not affiliated with or sponsored by Linden Research." If you are using "SL" or "inSL" anywhere in your domain name, the notice and disclaimer must be in the footer of your website's home page. Otherwise, it must be provided where notices and disclaimers are usually included, for example, a footnote on the first page of a document, the footer or last line of a web page or blog entry, an attribution section, or a credits page.

## Terms and Conditions for Using SL™ or inSL™

1. **The License**. Subject to the following terms and conditions, Linden Research, Inc. ("Linden Lab") grants Second Life® residents in good standing (as defined in Paragraph 2 below) a limited, non-exclusive, non-transferable, royalty-free, fully paid-up, worldwide license to show the association of their business or organization with the Second Life virtual world by using the words "SL" or "inSL" with a business or organization name, product or service name, and Internet domain name (any or all of these names, when used with "SL" or "inSL," are referred to as an "SL Associated Name") (collectively, the "License").
2. **License Eligibility**. To qualify for this License, you must have a Second Life account in good standing; agree to Linden Lab's posted Terms of Service and Community Standards; and never have received a permanent ban from the Second Life world for any violation of the Terms of Service or Community Standards. Linden Lab shall have sole discretion to determine whether you meet these criteria for eligibility.
3. **Use Guidelines**. Your use of "SL" or "inSL" in an SL Associated Name must be in strict compliance with the above Guidelines for Using SL™ or inSL™, which may be amended from time to time. Any other use of the SL or inSL trademarks or of any other trademark, brand name, or logo of Linden Lab must be in compliance with the Guidelines for Using Linden Lab's Trademarks, found at

http://secondlife.com/corporate/brand/trademark, which also may be amended from time to time.

4. **Review Process**. Upon Linden Lab's request, you shall supply Linden Lab, at no cost and with no obligation to return, suitable specimens of your use of "SL" or "inSL" to verify your compliance with this License. If at any time your use of "SL" or "inSL" does not conform to the terms and conditions of this License in Linden Lab's sole opinion, Linden Lab shall have the right to request that you modify or terminate your use, and you agree to comply with Linden Lab's request within seven (7) days after it was made.

5. **Rights and Ownership**. Linden Lab shall remain the exclusive owner of the SL and inSL trademarks. Your use of "SL" and "inSL" shall inure exclusively to the benefit of Linden Lab. You shall not do anything to compromise Linden Lab's rights in and to the SL and inSL trademarks or any of Linden Lab's trademarks. For example, you shall not interfere with Linden Lab's own use or registration of "SL" or "inSL," alone or in combination with other words or symbols, and you shall not file a trademark application anywhere in the world, now or in the future, for "SL" or "inSL," for any SL Affiliated Name, or for a mark that incorporates or is confusingly similar to SL, inSL, or another Linden Lab trademark.

6. **No Warranties**. The SL and inSL trademarks are provided to you "as is," and you are solely responsible for your use of the SL and inSL trademarks. Linden Lab disclaims all warranties, express or implied, regarding the SL and inSL trademarks, including but not limited to warranties of title and non-infringement of third-party rights. In no event shall Linden Lab be liable for any direct, indirect, incidental, special, consequential, punitive, or other damages arising from or related to this License, its termination, or your use of "SL" or "inSL."

7. **Modification and Termination**. This License shall terminate automatically upon your breach of any of its terms and conditions. Linden Lab shall have the right to terminate or modify your permission to use "SL" or "inSL" in an SL Affiliated Name at any time for any reason, in its sole discretion, without liability or obligation to you of any kind. Linden Lab shall also have the right to take action against any use of "SL" or "inSL" that does not conform to the terms and conditions of this License, infringes any of Linden Lab's intellectual property or other rights, or otherwise violates applicable law. If Linden Lab notifies you that this License is terminated, you shall cease all use of your SL Affiliated Name and remove all uses of it from all materials and items under your control within seven (7) days after the date that notice was given.

8. **No Partnership**. Linden Lab has no obligation to provide any type of support for your product or service. You acknowledge that no joint venture, partnership, employment, or agency relationship exists between you and Linden Lab.

9. **Community Directory**. You permit Linden Lab to include your SL Affiliated Name in a public listing or index of Second Life businesses, organizations, domain names, products, or services. Your permission is royalty-free, fully paid up, and worldwide.

10. **Choice of Law and Venue**. This License shall be governed in all respects by the laws of the State of California without regard to conflict of law principles. You agree to submit to the exclusive jurisdiction and venue of the courts located in the City and County of San Francisco, California to resolve any legal matter arising from this License. If a court of competent jurisdiction holds invalid any provision of this License, all remaining provisions of the License shall remain in full force and effect, and the

invalid provision shall be changed and interpreted in order to best accomplish the original provision's objectives to the fullest extent allowed by law.

11. **Complete Agreement**. This License, including all documents that it links to, is the entire agreement between you and Linden Lab concerning the SL and inSL trademarks.

Linden Lab may request changes to or removal of any uses of "SL" or "inSL" that we believe do not comply with the above <u>Guidelines</u> or <u>Terms and Conditions,</u> or that might otherwise impair our rights in the trademarks. Linden Lab may revise or update these Guidelines and Terms and Conditions for using "SL" or "inSL" at any time.